Filed 1/9/25  P. v. Barraza CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSE LUIS BARRAZA,<br><br>    Defendant and Appellant. | F088699<br><br>(Super. Ct. No. BF192742A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary, and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

While driving from Arvin to Bakersfield with Merlin Noe Rodriguez Valle (Valle) in Valle's car, Jose Luis Barraza (appellant) fatally stabbed Valle and later sold the car for $500. A jury convicted appellant of first degree murder (Pen. Code, §§ 187, subd. (a), 189, subd. (a); count 1)[1] with an enhancement for the use of a deadly weapon (§ 12022, subd. (b)), and second degree robbery (§§ 211, 212.5, subd. (c); count 2) with enhancements for the use of a deadly weapon and personal infliction of great bodily injury (§ 12022.7, subd. (a)). In a bifurcated proceeding, the trial court found appellant suffered a prior strike conviction (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) and a prior serious felony conviction (§ 667, subd. (a)). The court sentenced appellant to 50 years to life plus six years in state prison.

Before trial, the trial court granted the People's motion to admit, under Evidence Code section 1101, subdivision (b), evidence of appellant's prior carjacking conviction, in which he stabbed, but did not kill, the victim and took his car. The court admitted the evidence for the limited purposes of showing intent, motive, and the existence of a common scheme or plan. Appellant contends this was an abuse of discretion, alleging the prior carjacking was not relevant to whether he committed willful, deliberate, and premeditated murder – one of the two potentially applicable theories of first degree murder. We conclude no abuse of discretion occurred because the prior carjacking was highly probative to the other potential theory of first degree murder – felony murder in the perpetration of a robbery or carjacking. We also determine that any presumed error was harmless. We affirm.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2.

## I. Discovery of Valle's Body and Initial Investigation.

On July 22, 2022, at approximately 6:30 p.m., two separate 911 callers reported seeing a dead body off the side of the road in an agricultural area northwest of the city of Arvin. Responding officers discovered Valle's body in the dirt on the north side of Buena Vista Boulevard, west of Comanche Drive. Officers observed blood on his face and chest, as well as apparent stab wounds to the chest and back.

Officers were initially unable to identify Valle's body and labeled him a "John Doe." Three days later, Valle's brother (the brother) contacted the Arvin Police Department and reported that Valle had been missing since July 22, 2022. The brother submitted a photo of Valle, and investigators were subsequently able to identify Valle as the decedent.[2]

Investigators learned that an Arvin police officer had conducted an enforcement stop on Valle's black BMW sedan in Arvin at approximately 2:00 p.m. on the day his body was discovered. Appellant was driving, Valle was in the front passenger seat, and the brother and Ramon Moreno (Moreno) were in the back seats. The traffic stop was based on expired registration and other moving violations. The officer ran a records check and discovered appellant was unlicensed. The officer asked Valle why he was not driving his own vehicle, and appellant interjected that he was driving because Valle was too tired. The officer instructed Valle not to allow appellant or any other unlicensed person to drive, then released them and the vehicle.

## II. Eyewitness Testimony.

### A. *Ramon Moreno*.

Moreno was initially charged as appellant's codefendant with the murder and robbery of Valle. Prior to appellant's trial, Moreno pled no contest to second degree

---

[2] The brother did not testify at trial.

robbery in exchange for a six-year sentence and dismissal of the murder charge. Under the terms of the plea agreement, he agreed to testify "completely and truthfully" at appellant's trial.

Moreno testified that on July 22, 2022, Valle and the brother showed up at his residence with appellant. Moreno had previously spent time with appellant but had never met Valle or the brother. Appellant told Moreno that Valle and the brother needed money for gas. Moreno agreed to give them a few dollars if they would give him a ride to a liquor store so he could buy a cigarette. They got into Valle's BMW and headed toward the store with appellant driving. Before they reached their destination, the BMW ran out of gas. Moreno and the brother walked to a nearby gas station and returned with a container of gasoline, and the group drove off.

Shortly thereafter, the BMW was stopped by law enforcement, as described above. The officer let them go, but Moreno had to drive because he was the only person with a license. After they drove out of view of the police, appellant said he wanted to drive and got back into the driver's seat. Moreno told appellant he wanted to get high, and appellant used a folding knife to break off a piece of methamphetamine for him, which Moreno smoked in the back seat.

Valle and the brother said they had recently sold a speaker to Mike P. (Mike), and appellant drove the group to Mike's residence to collect payment. The BMW ran out of gas as soon as they arrived. Appellant spoke with Mike separately while the others waited nearby. Appellant came back with the money, then went with the brother to get more gas.

Moreno testified that before appellant left with the brother, appellant approached him and said he wanted to take the BMW and everything inside of it. Appellant asked Moreno if he was "with him," and Moreno responded that he only wanted a ride home. During the conversation, there was no discussion of stabbing or killing anyone.

4.

After appellant and the brother returned with gas, appellant drove the four men to his residence. Cassandra Z. (Cassandra) and Marissa B. (Marissa) arrived soon after, and appellant gave Marissa a tattoo. Meanwhile, everyone except for the brother smoked methamphetamine. According to Moreno, everyone was getting along, and there were no arguments or fights.

Sometime later, Moreno decided to walk to his mother's house a few blocks away to get a ride home. However, appellant, Valle, Marissa, and Cassandra told Moreno they were going to Bakersfield and insisted on dropping him off along the way. Appellant drove the BMW, with Valle in the front passenger's seat, Moreno behind the driver, Marissa in the middle rear seat, and Cassandra in the right rear seat. The brother stayed behind at appellant's residence.

During the drive, appellant played music while Moreno, Marissa, and Cassandra smoked methamphetamine. Valle was talking on his phone, but Moreno could not make out what he was saying. Moreno stated that the atmosphere in the car was "normal" and that everyone seemed happy.

Upon turning onto Buena Vista Boulevard, appellant lowered the music and seemed to focus on what Valle was saying on the phone. Appellant looked at Valle suspiciously, and Valle set his phone down and said something to him about "tomorrow." To Moreno's surprise, appellant began swinging his right arm at Valle, striking him in the face and chest. Valle's blood sprayed all over the interior of the car. Although Moreno did not see a knife in appellant's hand, he could tell that appellant was stabbing Valle. Valle attempted to grab appellant's arm. The car began to swerve, and appellant pulled over to the side of the road. Valle slouched in the car seat, struggling to breathe, with his eyes rolling back.

After stopping the car, appellant got out, opened the front passenger's side door, and dragged Valle out. Moreno could not see what happened outside, but he heard loud banging noises on the rear passenger's side of the car. Appellant got back into the

5.

driver's seat and continued driving toward Bakersfield, leaving Valle on the side of the road.

While appellant was driving, Cassandra put water onto a shirt and gave it to appellant. Appellant used the shirt to wipe down a knife and clean blood off his face, then threw the shirt and knife out of the window. Appellant told everyone in the car not to say anything about what happened, and that he would "take the rap for it." He also instructed them that, if questioned by police, they should say that they left Valle with appellant's drug dealer.

Later during the drive, appellant told Cassandra to call Mike and tell him that "it's done." Cassandra called Mike on her phone and then handed it to Moreno, who told Mike that appellant said, "[I]t's done." Moreno then handed the phone to appellant, and appellant told Mike, "[I]t's done" and hung up.

Appellant drove the group to Joseph D.'s (Joseph) residence in Bakersfield. When they arrived, Mike was there, but Joseph was not. Cassandra and Marissa began cleaning the BMW while appellant carried bags from the trunk into the house. Appellant and Mike also discussed selling the BMW.

Sometime later, Joseph arrived at the residence, and appellant offered to sell him the BMW for $500. Joseph agreed to give Moreno a ride home, explaining that he needed to pick up money in Arvin to purchase the BMW and could drop Moreno off on the way. Once Moreno got home, he did not leave his house for the rest of the night. Moreno testified he did not receive any money for the sale of the BMW.

**B.** *Cassandra Z.*

At trial, Cassandra admitted to being in a car with appellant, Valle, and Marissa, but claimed Moreno was not present. She testified that during the drive to Bakersfield, appellant and Valle started fighting, and appellant ultimately left Valle on the side of the road. She did not recall anyone being hurt or stabbed or seeing any blood.

6.

Cassandra had provided greater detail in a prior law enforcement interview. She stated she went to appellant's residence with Marissa so Marissa could get a tattoo. Sometime later, they left in Valle's BMW "to take him to go get money" because he and his brother were stranded in Arvin. During the drive, appellant began searching for what she initially thought was his phone, but she later realized was a knife. Suddenly, appellant began striking Valle. Valle hit appellant back, and the two began fighting. Cassandra thought appellant was hitting Valle with his hand, but then she saw blood.

Cassandra stated the car stopped and appellant, Valle, and Moreno got out. Appellant and Moreno both struck Valle, who was standing and trying to defend himself. Appellant and Moreno then returned to the car, and appellant drove away, leaving Valle behind.

### C.    *Joseph D.*

Joseph D. testified he owned a residence in Bakersfield that he was renovating for resale. On July 22, 2022, he drove to the residence around 7:00 p.m. to meet Mike, whom he had paid to do some work on the house. When he arrived, there was a black BMW sedan parked in the driveway. Mike was there with four people—appellant, Moreno, and two women—who were cleaning the outside of the BMW and looking through items on the front porch.

Joseph told Mike to have the four people leave and to finish the work on the house. Mike offered to sell him the BMW for $500. Joseph was suspicious the car was stolen, but after Mike showed him a signed "pink slip," he agreed to buy it. He drove to Arvin to get the money for the car and gave Moreno a ride home along the way. When he returned, he gave the money to appellant, who then provided him the title and the keys.

A few days later, Mike contacted Joseph, prompting him to return the BMW. Joseph testified that he never recovered the $500 he had paid for it.

7.

**D.** *Appellant's Statement.*

On July 26, 2022, four days after Valle's body was discovered, appellant was interviewed while he was incarcerated in county jail on an unrelated offense. He had been booked into the jail earlier that morning.

Appellant stated he met Valle and the brother when he saw them in a park filling up water bottles. They informed him they were driving from Los Angeles to the Bay Area and were stuck in Arvin because they had run out of gas. Appellant told them he had cans at his residence that they could recycle and keep the proceeds to pay for gas. Valle and the brother then went to appellant's house, where he gave them food to eat. At some point, they ran into Moreno, who joined them.

The four left appellant's residence to go to a store so that Valle could get some money from Western Union. Along the way, they were pulled over by the police because the registration tags on Valle's car were out of date. Following the stop, they returned to appellant's residence instead of going to the store.

Around 4:00 p.m., Valle took appellant to get some methamphetamine. Along the way, they dropped off Moreno at his residence and the brother at a park. Valle then dropped appellant off at a drug dealer's residence, saying he would be back in 15 to 20 minutes, but never returned. Appellant stated he never saw Valle or the brother again.

**III. Further Investigation and Additional Evidence.**

Appellant was in possession of Valle's cell phone when he was taken into custody on July 26, 2022. Forensic examination revealed that appellant began using the phone after the date of Valle's death. Among other things, the phone showed text messages in which appellant identified himself by name, numerous calls to Mike, Cassandra, and Moreno, and appellant's own e-mail address had been entered into the device.

On August 2, 2022, appellant called Cassandra from jail. During the call, Cassandra asked appellant if he needed help getting rid of the "beamer."

8.

Officers located Valle's BMW in Bakersfield on July 30, 2022. Investigators interviewed the person driving the BMW, and concluded he was not a suspect in the homicide. Linear lacerations consistent with knife cuts were found on the front passenger-side headrest of the BMW. A suspected bloodstain was present on the front passenger seat, and suspected blood was found on the right rear hubcap.

Valle's autopsy revealed stab wounds to the left upper chest, right upper back, mouth, and left hand. The stab wounds to the chest and back were three to four inches deep, and hilt marks around the wounds indicated a knife had thrust all the way into the body. The stab wound to the mouth entered through the lower lip and was also three to four inches deep. The stab wound to the left hand entered through the back of the hand and exited through the front of the hand. The pathologist described the hand wound as a "classic defense type wound."

DNA swabs were taken from the suspected bloodstain on the BMW's front passenger's seat and from the suspected blood on the right rear hubcap. Valle could not be excluded as the sole DNA contributor for either swab. Valle's left hand was also swabbed for DNA, and appellant could not be excluded as a DNA contributor.

Call detail records and associated location data for Moreno's and Cassandra's phones showed movements consistent with departing Arvin at approximately 6:00 p.m. on the day of Valle's murder, passing the site where Valle's body was later found, and arriving at Joseph's property at roughly 7:00 p.m. Notably, Cassandra's phone records reflected an outgoing call at 6:27 p.m. to a number linked to Mike lasting eight seconds, and an incoming call at 6:31 p.m. from the same number lasting two minutes and 16 seconds.

## IV. Prior Carjacking.

In February 2020, appellant called V.P. and asked for a ride. V.P. described appellant as a friend. Around midnight, V.P. picked him up somewhere in Arvin, and they headed south on Comanche Drive. Appellant directed V.P. to turn onto Sycamore

9.

Drive, which led them into an agricultural area, so that he could urinate. Both men exited V.P.'s car and had a conversation. Suddenly, appellant stabbed V.P. in the chest with a knife and punched him in the face. V.P. fell to the ground. Appellant picked up V.P.'s phone and drove off in his car, leaving V.P. behind. V.P. was treated by paramedics but refused to go to the hospital.

In October 2020, appellant pled no contest to carjacking (§ 215, subd. (a)) and carrying a concealed dirk or dagger (§ 21310). The remaining charge, assault with a deadly weapon (§ 245, subdivision (a)(1)) was dismissed in the furtherance of justice. (See § 1385, subd. (a).)

## DISCUSSION

## I.     The Trial Court Did Not Abuse Its Discretion in Admitting Evidence of Appellant's 2020 Carjacking Conviction Pursuant to Evidence Code Section 1101, Subdivision (b). Any Presumed Error Was Harmless.

The trial court instructed the jury on two theories of first degree murder: felony murder predicated on robbery and/or carjacking, and willful, deliberate, and premeditated murder.[3] Appellant's challenge to the admission of the 2020 carjacking evidence pertains solely to the latter theory. He argues the trial court abused its discretion by admitting the evidence to establish intent, motive, and a common scheme or plan in the commission of a willful, deliberate, and premeditated murder, asserting that the evidence had no bearing on whether he acted with the premeditated and deliberate intent to kill.

We conclude, and appellant does not contest, that the 2020 carjacking evidence was clearly admissible for purposes of the other theory of first degree murder—to show appellant's intent, motive, and a common scheme or plan in the commission of felony murder. Thus, even assuming appellant is correct that the prior carjacking evidence was not relevant to whether he committed premeditated murder, he fails to show that its

---

[3]     The verdict forms do not indicate which theory the jury adopted in returning its first degree murder verdict. The jurors were instructed that they need not agree on the same theory. (See CALCRIM No. 548.)

admission constituted an abuse of discretion, because it was properly admitted on another ground. In any event, given the overwhelming evidence of guilt, and the trial court's clear instruction not to consider the prior carjacking as propensity evidence, any presumed error was harmless.

### A.    *Background.*

The People moved in limine to admit evidence of appellant's 2020 carjacking conviction pursuant to Evidence Code section 1101, subdivision (b). The People argued the prior incident was admissible to show that appellant acted pursuant to a common scheme or plan in which he accompanied victims in their cars, stabbed them in a rural location, and took their vehicles. The People further contended the incident was admissible to show appellant murdered Valle with the motive and intent to steal the BMW. Appellant objected, asserting that the prior incident was too dissimilar from the charged offenses to warrant admission and would only serve to "smear" him and suggest a propensity to commit the charged acts.

The trial court overruled the objection and granted the People's motion. It reasoned the 2020 carjacking and the charged offenses "have … a high degree of similarity," observing that in both instances appellant was armed with a knife, was in a car belonging to someone else, used the knife to stab the owner of the vehicle, left the owner on the side of the road, and took the vehicle without the owner's consent. On this basis, it concluded there was a "sufficient degree of similarity to support the inference" that appellant acted with the same motive and intent and utilized a common scheme or plan. The court also found that the probative value of the prior carjacking evidence "far exceed[s] any prejudicial effect" under Evidence Code section 352.[4]

---

[4]    The People also moved to admit evidence of two prior incidents from 2017 and 2018 in which appellant possessed a dirk or dagger. The trial court excluded the evidence pursuant to Evidence Code section 352.

11.

The trial court instructed the jury with CALCRIM No. 375 (Evidence of Uncharged Offense to Prove Identity, Intent, Common Plan, etc.), which read, in pertinent part:

> "If you decide that [appellant] committed the [2020 carjacking], you may, but are not required to, consider that evidence for the limited purpose of deciding whether:
>
> "A.    [Appellant] acted with the intent and/or mental state required to commit the crimes and allegations charged in Counts One and Two in this case;
>
> "B.    [Appellant] had a motive to commit the offenses alleged in this case; or
>
> "C.    [Appellant] had a plan or scheme to commit the offenses alleged in this case.
>
> "In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offense and the charged offenses.
>
> "Do not consider this evidence for any other purpose.
>
> "Do not conclude from this evidence that [appellant] has a bad character or is disposed to commit crimes."

At the jury instructions conference, appellant did not object to the above instruction or request any modification.

## B.    *Applicable law and standard of review*.

Evidence Code section 1101, subdivision (a), " 'prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion.' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 667.)  Subdivision (b) of that section clarifies that evidence of uncharged misconduct may be admitted when it is " 'relevant to establish some fact other than the person's character or disposition.' " (*Fuiava,* at p. 667.)  Such evidence "is admissible when it is logically, naturally, and by reasonable inference

relevant to prove some fact at issue, such as motive, intent, preparation or identity." (*People v. Daniels* (1991) 52 Cal.3d 815, 856; see Evid. Code, § 1101, subd. (b).)

"When reviewing the admission of evidence of other offenses, a court must consider: (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant." (*People v. Daniels, supra,* 52 Cal.3d at p. 856.)  This includes an assessment under Evidence Code section 352 of whether the probative value of the uncharged misconduct evidence "is substantially outweighed by the probability that its admission will … create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352, see *People v. Lewis* (2001) 25 Cal.4th 610, 637.)  Because this type of evidence can be so damaging, " '[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded.' " (*Daniels,* at p. 856.)  In other words, "uncharged offenses are admissible only if they have *substantial* probative value." (*People v. Thompson* (1980) 27 Cal.3d 303, 318.)

"We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352." (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.)  "A ruling subject to this standard of review 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Pineda* (2022) 13 Cal.5th 186, 222.)

**C.    *An abuse of discretion did not occur*.**

We begin our analysis by considering the trial court's stated basis for admitting the 2020 carjacking evidence pursuant to Evidence Code section 1101, subdivision (b) – that it showed appellant stabbed Valle with the motive and intent to steal his car, and that he acted pursuant to a common scheme or plan.

To be admissible to prove intent, evidence of an uncharged offense must be "sufficiently similar to the charged offense to support the inference that the defendant probably acted with the same intent in each instance." (*People v. Lindberg* (2008) 45 Cal.4th 1, 23; see *People v. Gallego* (1990) 52 Cal.3d 115, 171.) Comparable logic applies to the admission of a uncharged offense to prove motive – both crimes must be " 'explainable as a result of the same motive.' " (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1381, italics omitted; see *People v. Demetrulias* (2006) 39 Cal.4th 1, 14.)

Admission of an uncharged offense to establish that the defendant acted pursuant to a common scheme or plan requires "[a] greater degree of similarity." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.) "[E]vidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' " (*Ibid.*) "[T]he common features must indicate the existence of a plan rather than a series of similar spontaneous acts … the plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense." (*Id.* at p. 403.)

Here, as the trial court aptly observed, the prior carjacking and the charged offenses were markedly similar. In both cases, the victims were acquaintances rather than strangers. Appellant rode with each victim, directed them to a rural area, and stabbed them in the torso without warning. Following the attacks, appellant took the victims' vehicles and abandoned them on the roadside.

Given these striking similarities, the 2020 carjacking evidence was highly probative for the purposes identified by the trial court. Appellant's commission of the prior carjacking under nearly identical circumstances strongly supported the inference that, when he attacked Valle, he acted with the specific intent to commit a robbery or carjacking—the mental state required for felony murder. (§ 189, subd. (a); *People v.*

*Gutierrez* (2002) 28 Cal.4th 1083, 1140–1141.) Likewise, clear similarities suggested that appellant's motive was to steal Valle's BMW by force.

The common features of both offenses also demonstrated that appellant acted pursuant to a common scheme or plan. The evidence was particularly probative for this purpose because appellant's defense primarily rested on his assertion that Moreno was a biased and unreliable witness. The existence of a common scheme or plan is relevant because it tends to "prove the defendant engaged in the conduct alleged by the prosecution." (*People v. Myers* (2014) 227 Cal.App.4th 1219, 1224; see *People v. Ewoldt, supra,* 7 Cal.4th at p. 394, fn. 2 [evidence of a common scheme or plan is "admissible to establish that the defendant committed the *act* alleged"].) Thus, the prior carjacking evidence corroborated Moreno's testimony, which conclusively demonstrated that appellant killed Valle during the commission of a robbery and/or carjacking.

As noted above, appellant does not contest the admissibility of the 2020 carjacking as evidence of intent, motive, and common scheme or plan for the felony-murder theory. Nor does he contend that the evidence should have been excluded under Evidence Code section 352. Rather, appellant argues the prior carjacking evidence was inadmissible with respect to the premeditated and deliberate theory of first degree murder.

Although the trial court's ruling clearly indicated it found the prior carjacking was relevant to the felony-murder theory, the court's instruction on evidence of uncharged offenses (CALCRIM No. 375) did not state the evidence was limited to that theory. Relying on this instruction, appellant contends the court effectively admitted the evidence for both theories, and claims it was inadmissible for purposes of the premeditated-murder theory because it was not relevant to whether he acted with the premeditated and deliberate intent to kill. Specifically, he argues the prior carjacking was not relevant to intent because the crime of carjacking does not require the same mental state as premeditated murder. With respect to common scheme or plan, he asserts the prior carjacking was too dissimilar to the charged offenses to support admission, chiefly

because there was no evidence he intended to kill the prior carjacking victim.  Finally, as to motive, he maintains that his prior motivation to assault someone to steal a car did not reasonably suggest that he would later be motivated to kill someone to steal a car.

We need not address whether the prior carjacking evidence was relevant to the premeditated theory of first degree murder because it was properly admitted on other grounds.  As we explained above, the evidence was highly probative to the felony-murder theory and thus admissible under Evidence Code section 1101, subdivision (b).  Even assuming the prior carjacking was not relevant to whether appellant committed premeditated murder, the proper result would not have been exclusion of the evidence for all purposes.  (See Evid. Code, § 351 ["Except as otherwise provided by statute, all relevant evidence is admissible"].)  Rather, the remedy would have been a limiting instruction directing the jury to consider the prior carjacking evidence only for the purpose of determining whether appellant committed felony murder.  (See *id*., at § 355 [When evidence is admitted for a limited purpose, "the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly"].)  However, appellant does not contend on appeal that such a limiting instruction should have been given, nor did he request one below.[5]

In the absence of an instructional error claim, the only issue is whether the trial court's binary decision to admit or exclude the prior carjacking evidence was an abuse of discretion.  Given the substantial probative value of this evidence with respect to the felony-murder theory, we conclude that the trial court's ruling was not " 'arbitrary, capricious and patently absurd.' " (*People v. Pineda*, *supra*, 13 Cal.5th at p. 222.)

---

[5] At most, appellant vaguely asserts that the trial court "erred when it allowed the jurors to consider the uncharged acts for purposes of the premeditation and deliberation theory."  To the extent this can be construed as an instructional error claim, it is forfeited because it was not raised below.  (See *People v. Sanchez* (2016) 63 Cal.4th 411, 460 [failure to request instruction that certain evidence was admitted for a limited purpose forfeits the claim on appeal]; *People v. Smith* (2007) 40 Cal.4th 483, 516 [same].)

Accordingly, our review for an abuse of discretion reveals the trial court did not err, and we reject this claim.[6]

### D. *Any presumed error was harmless*.

A "state law error in admitting evidence is subject to the traditional *Watson*[7] test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439; see *People v. Gonzales* (2011) 51 Cal.4th 894, 924.)

Assuming, as appellant claims, that the 2020 carjacking evidence was inadmissible for the premeditated-murder theory, any error was harmless. Because the evidence was properly admitted on other grounds, its admission could not have been prejudicial. (See *People v. Gray* (2005) 37 Cal.4th 168, 204 [allegedly erroneous admission of uncharged offenses for one purpose could not have been prejudicial because the evidence was properly admitted for other purposes.]) The primary reason evidence of uncharged offenses is potentially prejudicial is the inherent "danger that the jury will conclude that [the] defendant has a criminal disposition and thus probably committed the presently charged offense." (*People v. Thompson* (1988) 45 Cal.3d 86, 109.) Exclusion of the prior carjacking evidence for the purpose of the premeditated-murder theory would not have mitigated this danger, because the evidence would still have gone before the jury.

Assuming further that the trial court erred in admitting the 2020 carjacking evidence for *any* purpose, we would still conclude the error was harmless. Independent of the prior carjacking, the evidence of appellant's guilt, under either theory of first degree murder, was overwhelming. Prior to the murder, appellant told Moreno he wanted to steal Valle's BMW and belongings. He waited until Valle was isolated from his

---

**6** Because we conclude the 2020 carjacking evidence was properly admitted, we necessarily reject appellant's claim that its admission violated due process. (See *People v. Albarran* (2007) 149 Cal.App.4th 214, 229 [admission of evidence does not violate due process unless there are no permissible inferences the jury may draw from the evidence].)

**7** *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)

brother, then stabbed him repeatedly without warning or provocation and forcefully removed him from the BMW. The stab wounds were inflicted to the chest, back, and face, and were driven with such force that the knife penetrated to the hilt. Soon after the stabbing, appellant contacted Mike and told him, "[I]t's done," clearly indicating the fatal attack had been planned in advance. Appellant then continued to Bakersfield, met with Mike, and promptly sold the BMW to Joseph for cash. Several days after the murder, appellant was found in possession of Valle's phone, which he had been using as his own. This evidence conclusively established that appellant killed Valle while robbing and carjacking him, and acted with the willful, deliberate, and premeditated intent to kill.

Appellant claims the evidence supporting first degree murder was not strong because it depended primarily on Moreno's testimony. He contends Moreno was not a credible witness given that he testified under a plea agreement, was using methamphetamine at the time of the murder, and admitted he initially lied to law enforcement claiming he was not present during the murder. However, Moreno's testimony was extensively corroborated by the physical evidence and testimony of other witnesses. Cassandra gave a similar account of the stabbing, and Joseph confirmed he saw appellant, Mike, and Moreno later that evening and bought the BMW from appellant for $500. The presence of Valle's blood both inside and outside the BMW, appellant's DNA on Valle's hand, and the stab marks on the passenger-side headrest were all consistent with Moreno's testimony. Furthermore, cell phone records corroborated Moreno's account of his and Cassandra's location at the relevant times and confirmed that Cassandra called Mike shortly after the murder, consistent with Moreno's testimony that appellant directed them to call Mike and tell him, "[I]t's done."

Finally, any prejudicial effect from the admission of the 2020 carjacking was minimized by the trial court's limiting instruction. As noted above, the court instructed the jury that it could only consider the evidence for the limited purposes of intent, motive, and common scheme or plan. The court expressly cautioned the jury that it could not

18.

consider this evidence for any other purpose, including propensity and criminal disposition. Absent evidence to the contrary, we presume the jury followed this limiting instruction. (*People v. Waidla* (2000) 22 Cal.4th 690, 725; *People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)

In sum, the allegedly erroneous admission of the 2020 carjacking evidence for the premeditated-murder theory could not have been prejudicial because it was otherwise admissible for the felony-murder theory. Thus, the guilty verdict rendered in this trial was surely unattributable to the purported error. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.) Even assuming the trial court erred in admitting the prior carjacking evidence for any purpose, the error was still harmless in light of the overwhelming evidence supporting both theories of first degree murder and the trial court's clear limiting instruction. We therefore conclude it is not reasonably probable that the verdicts would have been more favorable to appellant absent the purported error. (See *Watson, supra,* 46 Cal.2d at p. 836.)

## **DISPOSITION**

The judgment is affirmed.

LEVY, J.

WE CONCUR:

HILL, P. J.

GUERRA, J.*

---

* Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19.